UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VYERA Pharmaceuticals, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 19 CV 5652 |
| | ) | Hon. Marvin E. Aspen |
| WALGREEN Co., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Vyera Pharmaceuticals, LLC ("Vyera") sued Defendant Walgreen Co. ("Walgreens") for breach of contract. (Pl. Compl. ("Compl.") (Dkt. No. 1) ¶¶ 1, 35.) Vyera alleges Walgreens breached their distribution agreement relating to Daraprim (pyrimethamine), specifically the provision termed the "Shelf Stock Adjustment." (Compl. ¶¶ 2–5.) Defendants moved to dismiss the complaint for failure to state a claim. Walgreens argues Vyera failed to provide required notice of a pending price increase and that Vyera abused its discretion under the contract such that Walgreens is entitled to judgment as a matter of law on its affirmative defense of breach of the covenant of good faith and fair dealing. (Def. Mem. in Supp. of Mot. to Dismiss ("Def. Mem.") (Dkt. No. 25) at 1–2.)

**BACKGROUND**

For the purposes of evaluating this motion we take as true the Plaintiff's allegations contained in their Complaint. As a result, we largely rely on their Complaint in our discussion of the facts here. Vyera is a limited liability company formed in Delaware with a single member,

1

Phoenixus AG, a Swiss company headquartered in Zug, Switzerland. (Compl. ⁋ 7–8.) Walgreens is an Illinois corporation with its principle place of business in Deerfield, Illinois. (Compl. ⁋ 10.)

As of February 23, 2015, Amedra Pharmaceuticals LLC ("Amedra") owned the rights to market Daraprim in the United States. (Compl. ⁋ 15.) Daraprim is the brand name of pyrimethamine, a drug used to treat toxoplasmosis. (*Id.* ⁋ 2.) Daraprim is sold under two National Drug Codes ("NDC"),[1] 52024-0330-95 ("NDC-95 Daraprim") and 52054-0330-10 ("NDC-10 Daraprim") (Compl. ⁋ 22.) Amedra entered into a distribution agreement ("Distribution Agreement") with Walgreens that named Walgreens the exclusive specialty pharmacy provider of Daraprim in the United States. (*Id.* ⁋ 15.) In March of 2015, Impax Laboratories, Inc. ("Impax") acquired Amedra and its products, including the rights to distribute Daraprim in the US. (*Id.* ⁋ 16.) In August of 2015, Turing Pharmaceuticals AG (now Phoenixus AG) acquired the right to distribute Daraprim in the US from Impax. (*Id.* ⁋ 17.) Walgreens consented to assignment of its Distribution Agreement with Amedra to Vyera (then known as Turing Pharmaceuticals, LLC). (*Id.* ⁋ 17.)

The Distribution Agreement sets forth terms and conditions governing Walgreens' distribution of Daraprim in the US. (*Id.* ⁋ 18.) Walgreens agreed to purchase Daraprim at the drug's wholesale acquisition cost ("WAC") (*Id.*) The Distribution Agreement defines WAC as the "list price for [Daraprim] for wholesalers, distributors, specialty pharmaceutical providers and other direct accounts before any rebates, discounts, allowances or other price concessions." (*Id.*)

---

[1] National Drug Codes are "[a] coding system, implemented by NDC whereby each drug is given a code number, allows the identification of the drug manufacturer, its strengths and its quantity and, thus, is a means of identifying the cost of the drug pursuant to purchasing contracts." *In re Liljeberg Enter., Inc.*, 304 F.3d 410, 460 (5th Cir. 2002) (citation omitted).

The key provision in this agreement is Section 3.4, titled the "Shelf Stock Adjustment," which governs the effect of any changes to the WAC of Daraprim. (Compl. ¶ 19.) That section states:

> In the instance where the current WAC of Product … has decreased, [Vyera] will immediately provide notice to Walgreens of the price decrease, and on the effective date of the price decrease, . . . [Vyera] agrees to issue a check to Walgreens for the amount of the shelf stock adjustment amount [sic] within 30 days of the date of the request for payment by Walgreens. The shelf stock adjustment will be calculated by multiplying the price decrease amount (previous WAC less the current WAC price) by the inventory on hand. "Inventory-on-hand" is defined as [Daraprim] within or en route to Walgreens as of the effective date of the change to the WAC of [Daraprim]. Inventory-on-hand shall be provided by Walgreens via a report within 45 days of official price decrease notice. Further, in the instance where the current WAC of [Daraprim] . . . increases, . . . , and on the effective date of the price increase, Walgreens shall pay to [Vyera] the difference between the previous WAC price and the current WAC price with the price increase for all inventory-on-hand as of the effective date of the WAC increase (the "WAC Increase"). Walgreens shall pay the amount of the WAC Increase by check to [Vyera] within 30-days of the date of request for payment by Manufacturer.

(Compl. ¶ 19.)[2] Thus, in the event of a decrease in WAC of Daraprim, Vyera would pay Walgreens to offset its potential losses; in the event of an increase in the WAC of Daraprim, Walgreens would pay Vyera to maintain price uniformity across all stocked Daraprim. (Compl. ¶ 20.)

On August 11, 2015, Vyera increased the WAC of Daraprim by 4,154% from $17.63 per pill to $750 per pill. (*Id.* ¶ 21.) The same day Vyera allegedly sent Walgreens notice of the price change pursuant to § 3.4 of the Agreement. (*Id.*)

---

[2] The exact language of the agreement was attached to the Defendant's motion to dismiss, but not the Plaintiff's complaint. The Plaintiff does not dispute the accuracy of the contract attachment, but instead excerpts the language. While we quote the public form here, we may consider documents attached in such a manner at the motion to dismiss phase, since the Plaintiff refers to the contract in its complaint. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

On November 17, 2016, Vyera wrote to Walgreens to request an accounting of Walgreens' Daraprim inventory-on-hand as of August 11, 2015, so that Vyera could calculate the Shelf Stock Adjustment Walgreens owed under § 3.4 of the Distribution Agreement. (*Id.* ¶ 23.) Walgreens allegedly did not provide this data. (*Id.*) On February 3, 2017, Vyera claims to have followed up in writing to reiterate its request for inventory-on-hand information; Walgreens again allegedly did not provide the data. (*Id.* ¶ 24.)

On November 28, 2017, Vyera claims they again wrote to Walgreens requesting an accounting of Daraprim inventory-on-hand as of August 11, 2015. (*Id.* ¶ 25.) Walgreens responded on November 30, 2017, providing what Vyera characterizes as a "partial accounting" of its inventory data for Daraprim. (*Id.*) Vyera alleges the data showed inventory on Daraprim only for its central fulfillment sites, but not for its "dispensing only" fulfillment sites or any other additional sites that may have held Daraprim inventory. (*Id.*) As of August 11, 2015, Walgreens allegedly had an inventory of 6,146 pills of NDC-95 Daraprim at those sites and zero NDC-10 pills. (*Id.*) Vyera states they followed up with a request for Daraprim inventory-on-hand at *all* fulfillment sites, which Walgreens allegedly did not provide. (*Id.*)

On December 5, 2017, based on the inventory report from Walgreens, Vyera invoiced Walgreens for a Shelf Stock Adjustment of $4,501,945 for its NDC-95 Daraprim. (*Id.* ¶ 26.) Walgreens allegedly did not pay on this invoice. (*Id.*)

On December 18, 2018, Vyera followed up on its request for payment of the Shelf Stock Adjustment and submitted an updated invoice for NDC-95 Daraprim that included interest based on Walgreens' non-payment. (*Id.* ¶ 27.) Vyera also claims they again requested information on Walgreens' inventory-on-hand data on NDC-10 Daraprim as of August 11, 2015. (*Id.*)

On February 21, 2019, Vyera claims that during a phone call with Walgreens employees Frank Ferraro and Darin Osmond they reiterated their request for complete Daraprim inventory-on-hand data to calculate the full Shelf Stock Adjustment. (*Id.* ¶ 28) Vyera says it again followed up on its request through emails from its general counsel dated April 8 and April 22, 2019. (*Id.* ¶ 29.)

On May 31, 2019, Vyera received a letter from Walgreens' general counsel, declining to provide the requested inventory-on-hand information. (*Id.* ¶ 30.) Walgreens also declined to pay the Shelf Stock Adjustment at that time. (*Id.*) On June 12, 2019, Vyera alleges they sent a formal notice of dispute, in accordance with Section 14.4 of the Distribution Agreement, to Walgreens for refusal to pay the Shelf Stock Adjustment. (*Id.* ¶ 31.) Vyera indicated in that letter that it was prepared to discuss settlement of the parties' dispute. (*Id.*) To facilitate settlement, Vyera alleges it request Walgreens provide it information on its inventory of Daraprim on hand as of the August 11, 2015 price increase. (*Id.*) Walgreens declined to respond to this letter. (*Id.*)

On July 16, 2019, Vyera alleges it sent two invoices to Walgreens for Shelf Stock Adjustments for NDC-95 and NDC-10 Daraprim. (*Id.* ¶ 33.) Vyera claims it relied on previous partial inventory data it received from Walgreens in constructing the invoices. (*Id.*) The invoice for NDC-95 Daraprim relied on information Walgreens provided on November 30, 2017. (*Id.*) Vyera's estimate for the Shelf Stock Adjustment on NDC-95 was $4,501,945. (*Id.*) The invoice for NDC-10 states Walgreens owes Vyera $24,064,822.50, using Vyera's estimate of Walgreens' NDC-10 Daraprim inventory-on-hand and data from the Center for Medicare and Medicaid Services concerning NDC-10 use during the relevant timeframe. (*Id.*) Vyera claims Walgreens has declined to pay any of the Shelf Stock Adjustment to date. (*Id.* ¶ 34.)

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is meant to test the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990) (citing *Triad Assocs., Inc. v. Chi. Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989)). In evaluating a motion to dismiss, we "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). A court may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks enough facts "to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949–50 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. In determining plausibility, the court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice . . . ." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

"[W]hen the existence of a valid affirmative defense is so plain from the face of the complaint that the suit can be regarded as frivolous, the district judge need not wait for an answer before dismissing the suit." *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) (reversing a district court's dismissal based on an affirmative defense as granted without sufficient information).[3]

---

[3] Defendants' citation to our previous decision in *Davis* misses that we *did not* dismiss that case because there was some potential inference we could draw in the plaintiff's favor. *Davis v. Wells Fargo Bank*, No. 7 C 2881, 2008 WL 1775481, at *4 (N.D. Ill. Apr. 17, 2008).

> When reviewing the dismissal of a breach of contract claim the meaning of the contract must be determined from the words or language used, and a court cannot place a construction on the contract which is contrary to the plain and obvious meaning of the language. If the district court determines that the contract is unambiguous, it may determine its meaning as a matter of law. The unambiguous contract controls over contrary allegations in the plaintiff's complaint.

*INEOS Polymers Inc. v. BASF Catalysts*, 553 F.3d 491, 498 (7th Cir. 2009) (quoting *McWane, Inc. v. Crow Chi. Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000)). "Where the contract is ambiguous, 'the language is a question of fact which a [court] cannot properly determine on a motion to dismiss.'" *UIRC-GSA Holdings Inc. v. William Blair & Co., L.L.C.*, 264 F. Supp. 3d 897, 905 (N.D. Ill. 2017) (quoting *Victory Records, Inc. v. Kalnoky*, No. 15 C 9180, 2016 WL 3181706, at *2 (N.D. Ill. June 8, 2016)).

## ANALYSIS

### I. Failure to perform condition precedent

Walgreens argues Vyera failed to adequately plead performance of all conditions precedent to the Distribution Agreement. (Def. Mem. at 8.) Vyera responds that it does not need to plead with particularity at this stage.

"In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed." Fed. R. Civ. P. 9(c). Judgment on the pleadings is only appropriate where the plaintiff completely fails to generally aver that all conditions precedent have been performed or occurred. *Advantage Eng'g, Inc. v. Burks Pumps, Inc.*, 28 F.3d 1216, at *7 (7th Cir. 1994) (table op.).

Vyera is correct that general pleading satisfies the pleading requirements under Rule 9(c). Although Walgreens may be ultimately correct that Vyera failed to perform all conditions precedent, their position does not square with the procedural requirements at the pleading stage. Vyera adequately pleaded general compliance with all conditions precedent in paragraph 35 of

7

its Complaint. (Compl. ¶ 35.) Rule 9(c) does not require more than a statement that all conditions precedent were performed at this stage, so Vyera's general pleading is sufficient at this early date. Fed. R. Civ. P. 9(c).

## II.     Breach of implied covenant of good faith and fair dealing

Walgreens argues that it is entitled to judgment as a matter of law because Vyera's pleadings facially show a breach of the implied covenant of good faith. (Def. Mem. at 11.) Walgreens points to Turning (now Vyera) CEO Martin Shkreli's invocation of the Fifth Amendment in Congressional testimony when asked about the rationale for the Daraprim price increase as evidence that Vyera did not act in good faith. (Def. Mem. at 11–12.) Vyera points out that Shkreli faced several charges, including securities charges, that had nothing to do with the present dispute. (Pl. Reply to Def. Mot. to Dismiss ("Pl. Reply") (Dkt. No. 35) at 8.) Thus, Vyera argues even if an adverse inference were warranted, Walgreens' requested inference that there was no good faith rationale for the price increase is premature on these facts and at this stage. (*Id.* at 8.)[4]

The implied covenant of good faith is "essentially used as a construction aid in determining parties' intent." *Anderson v. Burton Assocs.*, 218 Ill. App. 3d 261, 267, 578 N.E.2d 199, 203 (1st Dist. 1991). Breach of the implied covenant of good faith is not a standalone tort claim but included within a breach of contract claim. *Id.* "When one party's contractual obligation is 'contingent upon a condition particularly within the power of that party,' the controlling party's discretion in bringing about the condition is limited by the implied covenant of good faith." *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013) (quoting *Dayan*

---

[4] Since we determine this argument is dispositive, we do not address Plaintiff's broader arguments about materiality of breach and waiver. (*See* Pl. Mem. at 8–10.)

*v. McDonald's Corp.*, 125 Ill. App. 3d 972, 988, 466 N.E.2d 958, 971 (1st Dist. 1984) (collecting cases)). The fact that contractual discretion is express does not limit the application of the covenant. *Id.* "Every contract contains an implied covenant of good faith and fair dealing." *McCleary v. Wells Fargo Sec.*, 2015 IL App (1st) 141287, 29 N.E.3d 1087, 1093 (1st Dist. 2015). "Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract." *Id.* "Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised 'reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Id.* (quoting *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 618 N.E.2d 418 (1st Dist. 1993).)

Breach of the covenant of good faith and fair dealing is sometimes pleaded as an affirmative defense to justify breach by the defendant. *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, No. 07 CV 1394, 2009 WL 1329217, at *6 (N.D. Ill. May 13, 2009). In the context of pleading a statute of limitations defense, we previous said "such affirmative defenses may only support a motion to dismiss 'when the plaintiff pleads itself out of court-that is, admits all the ingredients of an *impenetrable defense*.'" *Davis v. Wells Fargo Bank*, No. 07 C 2881, 2008 WL 1775481, at *3 (N.D. Ill. Apr. 17, 2008) (emphasis added) (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)). Courts in this district generally decline to make inferences about what is commercially reasonable at the motion to dismiss stage. *See, e.g.*, *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, No. 14 C 1859, 2017 WL 3592775, at *17 (N.D. Ill. Jan 9, 1987).

Vyera's decision to raise the price of Daraprim over 4000% overnight might breach the implied covenant of good faith and fair dealing. But, Walgreens ultimately asks too much in its request that we dismiss based on an affirmative defense that relies on a subjective reasonableness judgment about an adverse inference from invocation of the Fifth Amendment in Congressional testimony. (Def. Mem. at 7, 9–10.) Unlike the sole case the defendants cite where the plaintiff failed to file before expiration of the statute of limitations, reasonable people could potentially interpret Vyera's pricing decisions differently. *See Davis*, 2008 WL 1775481, at *3; *see also Elorac*, 2017 WL 3592775, at *17 ("'[W]hat is commercially reasonable' under the circumstances . . . is a 'question of fact.'" (quoting *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010))). Such a request is far more appropriate at either the summary judgment or trial phase. In other words, Walgreens is certainly free to plead this affirmative defense in its answer, but Vyera's suit is not facially frivolous, particularly viewing the facts in the Plaintiff's favor, as we are required to do.[5]

### III. Distribution agreement application to NDC-10 and NDC-95

Walgreens argues the Distribution Agreement's terms only cover NDC-10 Daraprim and not NDC-95 Daraprim, so we should dismiss all claims relating to NDC-95 Daraprim. (Def. Mem. at 13.) Vyera responds that the course of performance and purpose of the contract were to grant Walgreens exclusive rights to distribute *all* Daraprim, regardless of the drug code on the label. (Pl. Reply at 12–14.)

#### A. Contract interpretation and course of performance

---

[5] It is also unclear whether Walgreens' finger pointing over the "Shkreli price increase" might prove to be crocodile tears. (*Contra* Def. Mem. at 7.) Vyera alleges that Walgreens, not Vyera, kept the profits from the 4000% price increase. (Pl. Reply at 7.) If this proves true, Walgreens' accusations that Plaintiff acted in bad faith may prove misplaced.

Under Illinois law, a court looks first to the plain language to interpret the contract. *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (Ill. 2011). The primary objective of the court is to give effect to the intention of the parties. *Id.*; *Gallagher v. Lenart*, 226 Ill. 2d 208, 232, 874 N.E.2d 43, 58 (Ill. 2007). "A contract must be construed as a whole, viewing each provision in light of the other provisions." *Thompson*, 241 Ill. 2d at 441, 948 N.E.2d at 47. If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning. *Central Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). However, if the language of the contract is susceptible to more than one meaning, it is ambiguous. *Gallagher*, 226 Ill. 2d at 232, 874 N.E.2d at 58. "If the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent." *Thompson*, 241 Ill. 2d at 441, 948 N.E.2d at 47. A contract *is not* ambiguous simply because the parties dispute the meaning of a term. *Id.* "A contract has a latent ambiguity when although its terms are clear on their face extrinsic evidence creates uncertainty as to the meaning of the terms." *St. Joseph Data Serv., Inc. v. Thomas Jefferson Life Ins. Co. of Am.*, 73 Ill. App. 3d 935, 941, 393 N.E.2d 611, 616–17 (4th Dist. 1979). "Although parol evidence is admissible to correct a latent ambiguity, courts may not construe into a contract provisions which are not there in order to obtain a more equitable result." *Id.*

The Distribution Agreement contains a "Definitions" section that defines "Product" for the purpose of the entire agreement. (Def. Mem. at 13). This section refers to a product as pharmaceutical products listed in Exhibit A, which may be changed from time to time upon the mutual written agreement of the parties. (*Id.*) Exhibit A to the contract is a spreadsheet listing that lists the product, NDC, strength, and WAC as columns.

Exhibit A

PRODUCT AND PRICING

| Product | NDC | Strength | WAC |
|---|---|---|---|
| Daraprim (pyrimethamine) | 52054-330-10 | 25mg | $TBD |

(Def. Mem. at 3.) Spreadsheets are typically read with the information in the columns all applying to modify or relate to the other items in a row. *See* Todd H. Flaming, Using Databases in Your Practice, 86 Ill. B.J. 225, 226 (1998) (describing the function of database organizational tools); *see also* Jay A. Mitchell, Whiteboard and Black-Letter: Visual Communication in Commercial Contracts, 20 U. Pa. J. Bus. L. 815, 841 (2018) (describing the importance of giving visual representations in contract interpretation proper attention, including tables).[6] In other words, the row entry for NDC modifies the row entry for product within the same row. The plain meaning on the face of the Distribution Agreement, then, is that "Product" refers only to NDC-10 Daraprim.

"The parol evidence rule generally precludes evidence of understandings not reflected in the contract, reached *before or at the time of its execution*, which would vary or modify its terms." *W.W. Vincent and Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 757, 814 N.E.2d 960, 966 (1st Dist. 2004) (emphasis added) (citing *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521, 757 N.E.2d 952, 956 (1st Dist. 2001)). Nevertheless, "a course of dealing between the parties is admissible 'to explain, supplement, or add to the agreement (but not contradict it).'" *Midwest Builder Dist., Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 673, 891

---

[6] Although the product name Daraprim is identical for both NPC-10 and NPC-95, we cannot pretend to not understand basic logic in reading a table, despite Plaintiff's invitation to us to do so.

N.E.2d 1, 27 (1st Dist. 2007) (quoting *Scott v. Assurance Co. of Am.*, 253 Ill. App. 3d 813, 818, 625 N.E.2d 439, 443 (4th Dist. 1993)). "[T]he course of performance is more than an interpretive tool; it may also give rise to waiver of express contractual terms if those terms are not strictly adhered to. Waiver is defined as the intentional relinquishment of a known right." *Id.* at 676, 625 N.E.2d at 28; *see also Neal-Cooper Grain Co. v. Tex. Gulf Sulphur Co.*, 508 F.2d 283, 292 (7th Cir. 1974) ("Where the contract involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.").

Subsequent to the execution of the Distribution Agreement Vyera alleges it supplied Walgreens with *both* NPC-10 and NPC-95 Daraprim. (Compl. ¶ 25, 33.) The Complaint also states Walgreens returned an inventory-on-hand form that showed Walgreens had millions of dollars in NPC-95 on hand. (*Id.*) Since Walgreens apparently did not request written confirmation that the shipments of NPC-95 they received were covered under the contract, but instead continued to distribute both product packaging types, Walgreens arguably waived the requirement of a written update to the definition of "Products" through their performance. (*See id.* ¶ 33.) Construing the facts in the light most favorable to the Plaintiff. This behavior suggest Walgreens may have understood Vyera's actions as enlarging the scope of the Distribution Agreement. In other words, Vyera has sufficiently pleaded and argued that the course of performance confirmed the parties' mutual understanding that the Distribution Agreement granted Walgreens exclusive authority to distribute both product codes for Daraprim, even though the agreement only explicitly references one product code. (Compl. ¶ 25, Pl. Reply at 12–13.) At this early stage we do not pass judgment on the ultimate legal truth of this theory.

Although it is tempting to term this a mere scrivener's error, we decline to do so at this juncture. Scriveners errors are sometimes entitled to reformation under Illinois law. *Estate of Blakely v. Fed. Kemp. Life Assur. Co.*, 257 Ill. App. 3d 100, 106, 640 N.E.2d 961, 966 (2d Dist. 1994). For example, a missing decimal point is a scrivener's error. *Id.* On the other hand, "using a correct set of numbers for an incorrect year to compute premiums when one should be using a different set of numbers, i.e., insurance rates for the correct year, does not in our opinion constitute a scrivener's or clerical error." *Id.* Thus, scrivener's errors should be obvious from the face of the document, without a need to incorporate extrinsic or parol evidence. *Id.*

Here the legal significance of NDC's precludes us from finding this is necessarily a mere scrivener's error. NDC's have particular significance in identifying whether states are required to pay for prescription drugs under the Medicaid statute. *U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, 38 F. Supp. 3d 398, 404 (S.D.N.Y. 2014). Qualification and listing for the program occurs in accordance with the drug's unique 11-digit NDC. *Id.* In other words, the difference between NDC-95 and NDC-10 could be extremely significant, particularly if only one is listed with the Center for Medicare and Medicaid Services. *Id.*[7] Thus, listing one NDC without listing another is

---

[7] NDC's identify a drug's "manufacturer, its strengths and its quantity." *In re Liljeberg Enter., Inc.*, 304 F.3d at 460. Here, the strength and quantity were identical, but the packaging was not. Under the plain reading of the phrase "NDC" in Exhibit A, then, these are not identical products. Nevertheless, the final three digits of the NDC code are all that differ. These digits merely "differentiate between different quantitative and qualitative attributes of the product packaging." U.S. Food & Drug Admin., *Nat'l Drug Code Directory*, https://perma.cc/6JPA-UUY4. In contrast, the second set of three numbers, "the product code, identifies a specific strength, dosage form, and formulation of a drug for a particular firm." *Id.* Thus, Vyera is correct that all physical and dosage characteristics of Daraprim are identical between NDC-95 and NDC-10. It is difficult to conclude definitively that this was not a mere oversight in this context, without further discovery.

not such an obvious error as to be plain error on the face of the document without incorporating parol evidence.[8]

### B. Judicial estoppel

Walgreens argues judicial estoppel precludes Vyera from asserting the Distribution Agreement covers NPC-95 and NPC-10, since Vyera previously asserted the two were categorically distinct products in prior litigation. (Pl. Reply at 13.) Walgreens points to a filing in a previous case to support its argument. (*Id.*); Brief for Defendant in Opposition to Summary Judgment at 11 n.5, *Impax v. Turing*, No. 16-3241 (S.D.N.Y. Nov. 14, 2016).[9]

"Judicial estoppel is an equitable concept that prevents parties from playing "fast and loose" with the courts by prevailing twice on opposing theories." *In re Airdigm Commc'n, Inc.*, 616 F.3d 642, 661 (7th Cir. 2010). The Supreme Court has emphasized that there is no formula for judicial estoppel, but identified at least three pertinent factors for courts to examine:

> (1) whether the party's later position was 'clearly inconsistent' with its earlier position; (2) whether the party against whom estoppel is asserted in a later proceeding has succeeded in persuading the court in the earlier proceeding; and (3) whether the party 'seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'

---

[8] It may prove relevant, however, that two NDCs are frequently mixed at the pharmacy level, usually when a pharmacy bills a terminated NDC, but actually dispenses a different package size. *U.S. ex rel Fox Rx*, 38 F. Supp. 3d at 406. Thus, it is not at all clear that NDCs are actually important in the course of performance, despite being conceptually distinguishable, particularly when the only difference is in the packaging. *Id.*

[9] "On a Rule 12(b)(6) motion to dismiss, judicial notice can be taken of other court proceedings." *U.S. ex rel. Bidani v. Lewis*, No. 97 CV 6502, 1998 WL 1820753, at *6 (N.D. Ill. Dec. 29, 1998) (citing *Scholes v. Lehman*, 56 F.3d 750, 762 (7th Cir. 1995), *cert. denied*, 516 U.S. 1028, 116 S. Ct. 673 (1995) (mem.)). We therefore take official notice of these proceedings in order to determine the propriety of judicial estoppel here.

*Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S. Ct. 1808, 1814–15 (2001)). "A fourth factor to consider is whether the operative facts remain the same in both cases." *Crosby v. Bowater Inc. Ret. Plan For Emps. of Great N. Paper, Inc.*, No. 05 C 3478, 2006 WL 2578928, at *5 (N.D. Ill. Sept. 1, 2006). In addition, "there is no requirement that the parties be the same for judicial estoppel to apply. What matters for purposes of judicial estoppel is whether, in reaching its earlier decision, the court relied on the representation of the one against whom estoppel is asserted." *Id.* at 662.[10] "[N]o existing case law had made judicial estoppel dependent on the existence of a judicial opinion." *U.S.* ex rel. *Bidani v. Lewis*, No. 97 CV 6502, 1998 WL 1820753, at *8 (N.D. Ill. Dec. 29, 1998).

Vyera is not judicially estopped from claiming NPC-95 and NPC-10 Daraprim are the same product functionally. Vyera, then called Turing (a change in name only), argued that its contract with Impax defined "Inventory" solely with reference to NDC-95, but not NDC-10. (Pl. Reply at 13.) Vyera's position in that litigation was that the contract term only included the NPC-95 product, in a similar schedule to the one present in the Vyera-Walgreens Distribution Agreement. Brief for Defendant in Opposition to Summary Judgment at 11 n.5, *Impax v. Turing*, No. 16-3241 (S.D.N.Y. Nov. 14, 2016). Vyera's contract with Impax concerned the US intellectual property and broad distribution rights to Daraprim and contained different contractual terms than a specialty pharmacy distributor contract. *Id.* It is not clear that it would be unfair to allow Vyera to interpret the Distribution Agreement that represents a different

---

[10] A change in corporate name does not change the identity of the corporate party. *See Amari Co., Inc v. Burgess*, 955 F. Supp. 2d 868, 880 (N.D. Ill. 2013) (finding a party "cannot be heard to argue that judicial estoppel does not apply because a nominally different party (their corporate counterparts) succeeded on the argument in [a previous] court"). This is particularly true where the only change was in *name*; there was no apparent passing of interest or change in corporate organization.

relationship differently. Vyera and Walgreens operate on different levels of the market (Walgreens is a consumer-facing pharmacy, while Vyera does not provide consumer services), whereas Vyera and Impax are essentially competitors (both develop new pharmaceutical products and sell them to retailers). Finally, since the operative facts diverge in a number of respects between the two cases, we could not apply judicial estoppel to anything more than the generic assertion that NPC-95 and NPC-10 are identical products. It does not appear that Vyera ever argued that the two products were distinguished beyond their packaging, so it is hard to fathom estopping them now from arguing the two products are indistinguishable in their function. Even if we felt it plausible, we certainly are not required to apply judicial estoppel. Therefore, we decline to do so at this stage.

IV. **Advanced notice defect**

Walgreens argues Vyera breached the Distribution Agreement's notice provision by failing to inform Walgreens of the August 11, 2015 price increase more than twenty-four hours in advance. (Def. Mem. at 12.) Walgreens points to language in the complaint that Vyera gave notice "[o]n the same day" it was imposed. (*Id.*) Walgreens argues failure to give twenty-four hours of notice constitutes failure to comply with the contractual prerequisite to the Shelf Stock Adjustment, and thus Walgreens does not need to perform on their end of the contract. (*Id.*)

Under Illinois law, a court looks first to the plain language to interpret the contract. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). The primary objective of the court is to give effect to the intention of the parties. *Id.*; *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). Illinois Courts avoid interpreting contracts in a manner that would "nullify or render provisions meaningless." *Fid. Nat'l Title Ins. Co. v. Westhave Props. P'ship*, 386 Ill. App. 3d 201, 214, 898 N.E.2d 1051, 1063–64 (1st 2007). In *Fidelity*, the Court declined to overlook a provision in a

17

partnership agreement requiring notice and a right of first refusal in all other partners before a partner sold his interest. *Id.* Similarly, in *Thakral v. Mattran*, an Illinois appellate court strictly enforced a requirement that a party provide written notice in a land sale option contract, rather than oral notice, even if written notice was eventually provided after the contract deadline. 156 Ill. App. 3d 849, 856, 509 N.E.2d 772, 776 (2d Dist. 1987). In *Thakral*, earnest money was provided to keep open an option to purchase land, meaning that the dispute was over consideration for precisely the bargained-for period of time. *Id.* Not all breaches of a contract are necessarily material. *See Mohanty v. St. John Heart Clinic*, 225 Ill. 2d 52, 70, 866 N.E.2d 85, 95 (Ill. 2006) "[W]hether or not a material breach of contract has been committed is a question of fact." *Id.* at 72, 866 N.E.2d at 96.

Unlike *Fidelity*, Vyera did comply with the material terms of the Distributor Agreement's notice requirement. Vyera provided written notice of the price increase. Unlike in *Fidelity*, Walgreens had no option to contest a price increase and no rights that it could exercise in the event that Vyera gave notice earlier. 386 Ill. App. 3d at 215, 898 N.E.2d at 1064. In *Fidelity* the nonselling partners' right of first refusal and right of appraisal both required a month of notice, because both were rights that took time to exercise. *Id.* In contrast, Vyera appears to have only been required to notify Walgreens so that Walgreens could adjust their prices to allow passthrough of any price changes to customers. (Pl. Reply at 10–11.) Similarly, *Thakral* dealt with an option contract where the notice requirement was a condition precedent to *repayment* of the consideration to keep open the option. 156 Ill. App. 3d at 855–56, 509 N.E.2d at 776. In other words, the contract created a clear right in the option holder to prevent others from purchasing the land until a specified date, so a clear contractual right turned on the consideration. *Id.* In sharp contrast, no apparent right is secured in the price-change notice provision. (Pl. Reply

18

at 10.)[11] While Walgreens may be correct that it is not responsible for any price change until it had twenty-four hours' notice of the change, that would simply mean it was responsible for Shelf Stock Adjustments beginning August 12th or 13th instead of starting on the 11th or 12th. (*See id.*) We therefore decline to strictly construe the language of the contract, upon which no rights or reliance interests depended, at this early stage of the litigation.

## CONCLUSION

For the foregoing reasons we deny Walgreens' motion to dismiss for failure to state a claim. It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: January 28, 2020
Chicago, Illinois

---

[11] The closest "right" is that Walgreens will pay invoices at the price in effect from the last pricing action date where such complete notification was provided. (Def. Mem. at 4.) The exercise of this right does not turn on notice being provided twenty-four hours in advance, it simply begins to run twenty-four hours after proper notice is given so that Walgreens can appropriately adjust its prices. Notably, the notice mentioned in the Shelf Stock Adjustment section of the contract *does not* mention a specific twenty-four hour requirement. Instead, it simply requires "Manufacturer will provide notice of the price increase," and then generally makes reference to "the effective date of the price increase." (Def. Mem. at 4.) Thus, there is not strict technical language or a clear material condition to construe against Vyera in the relevant section of the contract, even accepting all of Walgreens' legal positions as true.